# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

———————————————————————

JAMES TIMOTHY WALTON,[1]

              Plaintiff,

        v.                    Civil Action No.
                                  9:05-CV-0194 (LEK/DEP)

MR. BREEYEAR, *et al.*,

              Defendants.

———————————————————————

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF:

JAMES TIMOTHY WALTON, *Pro Se*


FOR DEFENDANT PAOLANO:

NAPIERSKI, VANDENBURGH      SHAWN F. BROUSSEAU, ESQ.
  LAW FIRM                   SHAWN T. NASH, ESQ.
296 Washington Avenue Extension
Albany, New York 12203


FOR COUNTY DEFENDANTS:

———————————————

      [1]    Although originally referring to himself as "Timothy Walton" in his complaint, plaintiff has since notified the court that his name is "James Timothy Walton" and that he would like the record to reflect that fact.  Dkt. No. 26; Nash Aff. in Support of Defendant Paolano's Motion ("Nash Aff.") (Dkt. No. 28) Exh. A, at 8.  The court will therefore refer to plaintiff as "James Timothy Walton".

GIRVIN & FERLAZZO LAW FIRM          GREGG T. JOHNSON, ESQ.
20 Corporate Woods Blvd.            JACINDA H. CONBOY, ESQ.
Albany, New York 12211

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff James Walton, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action

pursuant to 42 U.S.C. § 1983 alleging deprivation of his constitutional

rights.  In his complaint, plaintiff alleges that while confined at the

Washington County Jail ("WCJ") awaiting resolution of a parole violation

charge, he was punched by another inmate, attributing the incident to

defendants' failure to properly protect him from harm during his

incarceration.  Plaintiff also claims that he was denied adequate medical

care for his injuries arising out of that incident, that his due process rights

were violated at a disciplinary hearing conducted to address his actions

during the altercation, that prison officials interfered with his legal mail,

and that he was harassed and called racially derogatory and other

offensive names by corrections workers.  *Id.*  As relief, *inter alia*, plaintiff

seeks recovery of one million dollars in damages as well as an order

2

requiring the defendants to undergo testing to determine their mental fitness for duty.

Currently pending before the court are two motions, both seeking the entry of summary judgment dismissing plaintiff's complaint.  In their motion, defendants William Breeyear, Michael Mondoux (sued as "Michael Moundo"), David Jamieson, Julie Beecher (sued as "Nurse Julie"), and Ford Burch (collectively, the "County defendants") assert that plaintiff's claims are procedurally barred as a result of his failure to properly exhaust available administrative remedies before commencing suit, and additionally argue that, as a matter of law, his claims against them lack merit.  The second motion, filed on behalf of defendant Dr. Paolano, focuses upon plaintiff's medical indifference claim, arguing that as a matter of law that cause of action is not supported by the evidence in the record.  Plaintiff has not responded to either motion.

Based upon a thorough review of the evidence now before the court, though somewhat handicapped by plaintiff's failure to oppose the two pending motions, I find that by not including it in their answer, the County defendants have waived the defense of failure to exhaust administrative remedies.  Turning to the merits of plaintiff's various claims, I am unable

3

to discern the existence of any genuine, triable questions of material fact as to any of the issues raised in defendants' motions, and conclude that they are entitled to summary judgment dismissing plaintiff's complaint in its entirety.

I.    BACKGROUND

Although recited by him in a most conclusory fashion, the essential allegations surrounding plaintiff's claims can be gleaned from Walton's complaint.[2]  Defendants' versions of the underlying facts are set forth in detail in a series of affidavits and documents submitted in support of their motions.  A comparison of those materials reveals that for the most part, the facts underlying plaintiff's claims are not particularly controversial.

Plaintiff, an admitted former drug dealer, *see* Nash Aff. (Dkt. No. 28) Exh. A, at 77, was arrested on December 2, 2004 by representatives of the Washington County Sheriff's Department for a parole violation, based

---

[2]      Since plaintiff's complaint is verified, it represents the equivalent of a sworn affidavit for the purposes of the pending summary judgment motions.  28 U.S.C. § 1746 (1994); Fed. R. Civ. P. 56(e); *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1998) (citations omitted); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *Yearwood v. LoPiccolo*, No. 95 CIV. 2544, 1998 WL 474073, at *5-*6 & n.2 (S.D.N.Y. Aug. 10, 1998); *Ketchmore v. Gamache*, No. 96 CIV. 3004, 1997 WL 250453, at *4 n. 1 (S.D.N.Y. May 12, 1997).  As will be seen, however, plaintiff's allegations, although sworn, must nonetheless be considered in the context of admissions deemed to have been made by virtue of his failure to respond to defendants' Local Rule 7.1(a)(3) Statements.  *See* pp.18-20, *post*.

upon an earlier felony drug conviction, and was booked into the WCJ on that same date.  Nash Aff. (Dkt. No. 28) Exh. A, at 17, 77, 97; *Id.*, Exh. B. Upon his arrival at the WCJ facility plaintiff was searched, and was placed in a holding area, consisting of a glass-walled booth, where he remained for approximately two hours.[3]  Nash Aff. (Dkt. No. 28) Exh. A, at 75, 98-102; Jamieson Aff. (Dkt. No. 29) ¶¶ 4-5.  Plaintiff claims that during that time he was humiliated, laughed at, and taunted by Nurse Administrator Beecher, Officer Jamieson, and Sergeant Breeyear, and that Officer Jamieson called him names such as "coon" and "darkie."  Complaint (Dkt. No. 1) § 6.  Walton concedes, however, that he could not actually hear any comments which may have been made while he was in the holding cell.  Nash Aff. (Dkt. No. 28) Exh. A, at 100-02.

On December 25, 2004, plaintiff experienced a verbal confrontation with another WCJ inmate, causing him to feel threatened and afraid for his life.  Nash Aff. (Dkt. No. 28) Exhs. A, at 28-29, C, D.  Despite his

---

[3]   The search of the plaintiff was conducted based on the information provided by the arresting officer, suggesting that plaintiff possessed and may have swallowed drugs and that plaintiff was being confined at the WCJ for violating his parole arising from his felony drug conviction, Officer Jamieson believing that cumulatively, this information provided sufficient cause to search Walton.  County Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 29) at ¶¶ 10-11; Jamieson Aff. (Dkt. No. 29) ¶¶ 4-5.

apprehension, however, plaintiff never requested a "no contact" order indicating that he was fearful of that inmate, nor did he request any protection, supervision, or assistance or otherwise advise Officer Burch or Officer Jamieson that he believed that he was in danger. *Id*. Exh. A, at 139.

Later on that same date, while in his cell, plaintiff broke a cup and concealed a piece of the broken cup in his sleeve, apparently for use as a weapon against the fellow inmate. Nash Aff. (Dkt. No. 28) Exh. A, at 32. Plaintiff then asked Officer Jamieson for, and was granted, permission to leave his cell. *Id*. Shortly after leaving his cell, plaintiff was involved in a physical altercation with the same fellow inmate; during the course of that confrontation Walton used the weapon he had earlier fashioned from the broken cup, cutting the other inmate in the face. *Id.* Exh. A, at 33-34, 149-51; *id.* Exh. C. According to the plaintiff's deposition, as the other inmate began threatening him, Officer Burch approached and asked what the problem was.[4] Nash Aff. (Dkt. No. 28) Exh. A, at 32-33. Plaintiff alleges that as he turned toward Officer Burch to respond, the other inmate

_____

[4]     Although originally claiming that Officer Jamieson was present during the altercation, plaintiff later acknowledged that he had confused the officers' names, and that it was actually Officer Burch who witnessed the incident. Nash Aff. (Dkt. No. 28) Exh. A, at 32-35, 131-32.

unexpectedly punched Walton in the left side of his face, knocking him into the officer.[5]  Nash Aff. (Dkt. No. 28) Exh. A, at 33-35.  After Officer Burch pushed plaintiff off of him, Walton was forcibly subdued and handcuffed.  Nash Aff. (Dkt. No. 28) Exh. A, at 35-36.

As a result of the altercation, plaintiff was charged with five separate violations of the WCJ conduct policy.[6]  Convoy Aff. in Support of County Defendants' Motion ("Convoy Aff.") (Dkt. No. 29) Exh. B.  Following a hearing to address those charges, plaintiff was convicted on all five counts and sentenced to eighty days of disciplinary confinement in the facility's special housing unit ("SHU") for each violation, for a total of 400 days.[7]  Convoy Aff. (Dkt. No. 29) Exh. B.  Plaintiff was transferred on January 27, 2005 to the Downstate Correctional Facility, however, and was therefore required to spend only thirty-two days in SHU disciplinary confinement as a result of the incident.  Nash Aff. (Dkt. No. 28) Exh. A, at 47.

---

[5]     Officer Burch's report describes the incident differently, recording that the fellow inmate was acting in self-defense and that plaintiff struck the first blow and continued to swing until the officers could break up the fight.  Nash Aff. (Dkt. No. 28) Exh. D.

[6]     The other inmate was not charged with any violations in relation to the altercation. Nash Aff. (Dkt. No. 28) Exh. E.

[7]     It appears that criminal charges were also filed against Walton for the assault on his fellow inmate, although those charges were later dismissed due to the inmate's death.  Nash Aff. (Dkt. No. 28) Exh. A, at 42-43.

Following the altercation plaintiff was taken to the SHU, where he complained to Officer Bump that he could not hear out of his left ear. Nash Aff. (Dkt. No. 28) Exh. A, at 37-38.  According to plaintiff, in response to his complaints he was given an ice pack and some Tylenol.[8] Nash Aff. (Dkt. No. 28) Exh. A, at 37.

On the next day, December 26, 2004, plaintiff requested medical attention by filling out a medical request form.   Nash Aff. (Dkt. No. 28) Exh. G.  As a result of that request Walton was examined by Kim Grogriai, a prison nurse, who observed a small scab on his left ear, but with no drainage, and was treated with an antibiotic and provided with cotton ear plugs.[9]  Nash Aff. (Dkt. No. 28) Exh. G.  Notes of that intervention make reference to having a physician assess Walton's condition "Monday." Nash Aff. (Dkt. No. 28) Exh. G.

 Dr. Paolano examined the plaintiff on December 27, 2004, in response to his complaints of hearing loss in his left ear and left temporal

---

[8]      The first entry on medical records now before the court relating to injuries suffered during the fight is dated December 26, 2004.  *See* Nash Aff. (Dkt. No. 28) Exh. G.  There is no reference in the record to medical intervention or a request by plaintiff for treatment prior to that date.

[9]      In his deposition plaintiff claims not to have received any medical attention for two days after the initial examination on the day of the incident.  Nash Aff. (Dkt. No. 28) Exh. A, at 37-38.

area pain.  Nash Aff. (Dkt. No. 28) Exh. H; Paolano Aff. (Dkt. No. 28) ¶ 5.

Upon examination, Dr. Paolano noted a small abrasion in plaintiff's left ear

canal, and observed that his left tympanic membrane was ruptured.  *Id.*

Although Dr. Paolano determined that the ruptured area did not appear to

be infected, as a precautionary measure he prescribed a prophylactic

course of antibiotics.  *Id.*  Plaintiff was also given cotton balls and

instructed to keep water out of his ear while showering, and additionally

advised by Dr. Paolano that he could later obtain an earplug.  *Id.*  Dr.

Paolano also discussed with Walton the potential for repair of the ruptured

membrane once he was transferred into a state correctional facility.  *Id.*

Later on December 27, 2004, plaintiff again requested medical care,

complaining without elaboration that he did not feel well.  Nash Aff. (Dkt.

No. 28) Exh I.  In response to that request plaintiff was examined by

another nurse at the facility, who explained that the dizziness and nausea

being experienced by the plaintiff were potential side effects of his

ruptured eardrum.  *Id.*  Based upon her examination, the nurse provided

plaintiff with Motrin as well as extra cotton balls for his use while

showering.  *Id.*

Plaintiff was again examined on December 28, 2004, on this occasion

9

by Registered Nurse Julie Beecher.  Nash Aff. (Dkt. No. 28) Exh. I.

During that examination plaintiff advised Nurse Beecher that he continued

to experience "general malise [sic]."  *Id.*   Nurse Beecher repeated Dr.

Paolano's instructions for keeping plaintiff's ear dry while showering

through use of the cotton balls provided to him.  *Id.*  Following her

examination, Nurse Beecher consulted by telephone with Dr. Paolano,

who prescribed an additional course of prophylactic antibiotics.  Nash Aff.

(Dkt. No. 28) Exh. I; *see also* Paolano Aff. (Dkt. No. 28) ¶ 6.  The next

day, December 29, 2004, Nurse Beecher noted that plaintiff appeared to

be ambulating in his cell without difficulty.  Nash Aff. (Dkt. No. 28) Exh. I.

Additionally, she was advised by the officers in the SHU that plaintiff was

eating his meals, and had not lodged any complaints of discomfort or pain.

*Id.*

Dr. Paolano again examined the plaintiff on January 3, 2005, noting

on that occasion that the edges of plaintiff's rupture, which had been red,

were pink and his ear canal did not appear to be tender.  Nash Aff. (Dkt.

No. 28) Exh. J; Paolano Aff. (Dkt. No. 28) ¶ 7.  Dr. Paolano advised

plaintiff that he should consider getting better ear plugs since the outer ear

canal was no longer sensitive.  *Id.*

10

During the evening of January 3, 2005 plaintiff registered complaints of vomiting, and requested medical attention.  Nash Aff. (Dkt. No. 28) Exh. K.  Walton was examined on that evening by a medical employee, who advised that taking Motrin with his antibiotics may have irritated his stomach, causing him to experience discomfort.  *Id.*

On January 14, 2005, Dr. Paolano conducted a follow-up examination of the plaintiff.  Nash Aff. (Dkt. No. 28) Exh. J; Paolano Aff. (Dkt. No. 28) ¶ 8.  While plaintiff complained during that examination of suffering from occasional pain, Dr. Paolano noted no sign of infection in the area of the rupture.  *Id.*  Following his examination Dr. Paolano prescribed Ibuprofen for pain, and advised the plaintiff to return for medical attention as needed.  *Id.*

Plaintiff was transferred to the Downstate Correctional Facility, a prison operated by the New York State Department of Correctional Services ("DOCS"), on January 27, 2005.  Nash Aff. (Dkt. No. 28) Exh. A, at 10, 18.  Upon his transfer into that facility plaintiff was  examined on January 28, 2005 by a DOCS physician, who was unable to detect a perforation of the membrane.  Nash Aff. (Dkt. No. 28) Exh. M.

On January 31, 2005, plaintiff complained to DOCS medical

personnel of sharp ear pain of four hours in duration.  Nash Aff. (Dkt. No. 28) Exh. N.  A subsequent examination of plaintiff's ear revealed a healing left tympanic membrane perforation.  *Id.*  As a result of this finding, on that same day Walton was referred to a specialist, who cleaned out his ear and provided him with ear plugs.  Nash Aff. (Dkt. No. 28) Exh. A, at 61-62, 65-66.  Plaintiff testified that he had experienced a sixty percent hearing loss in his left ear and a forty-five percent hearing loss in his right ear as a result of the injury.  *Id*. Exh. A, at 62, 66.

Aside from the claims stemming from his entry into the WCJ and the fight with his fellow inmates and the ensuing medical treatment, plaintiff makes other allegations in his complaint.  Plaintiff also claims, for example, that Officer Jamieson denied him the right to call a witness at his disciplinary hearing, and that Sergeant Mondoux caused his legal mail to be opened, and delayed in sending it out "for a day or two."[10]  Complaint (Dkt. No. 1) § 6.

While at the WCJ, the only inmate grievance pursued by the plaintiff

---

[10]    In his deposition, plaintiff also claimed that a door near his cell was left open for at least three hours, making his cell very cold.  Nash Aff. (Dkt. No. 28) Exh. A, at 118-21.  While the County defendants address this allegation in their motion, plaintiff makes no claim regarding that incident in his complaint and, accordingly, it will not be addressed in this report.

through the established grievance process regarding any of the

allegations made in his complaint was filed on December 26, 2004,

challenging the failure of prison officials to discipline the other inmate

involved in the December 25, 2004 incident.[11] Conboy Aff. (Dkt. No. 29)

Exh. C, at 1-2.  That grievance was denied by the facility's grievance

coordinator in light of the fact that upon investigation, it was determined

that the other inmate had been acting in self-defense.  *Id.*  On January 4,

2005 plaintiff's appeal of that unfavorable determination to the chief

administrative officer was also denied, and the record indicates that

plaintiff affirmatively indicated his acceptance of that decision.  *Id*. Exh. A,

at 2; Nash Aff. (Dkt. No. 28) Exh. A, at 52.

In addition to grieving the failure of prison officials to discipline his

fellow inmate as a result of the fight, plaintiff claims to have submitted a

grievance regarding the medical care received from prison medical

officials.  Nash Aff. (Dkt. No. 28) Exh. A, at 56-59.  A copy of that

grievance was not produced through discovery, however, despite plaintiff's

contention that he kept copies of all the grievances he filed.  *Id.* Exh. A, at

---

[11]     Plaintiff filed two other grievances while at the WCJ, the first alleging that he was not receiving his non-pork meals, and the second related to a search of his cell.  Nash Aff. (Dkt. No. 28) Exh. A, at 49-50, 54-55.

55-57.  In addition, at his deposition plaintiff did claim to have submitted a

grievance complaining of the temperature in his cell.  *Id.* Exh. A, at 55-56.

He acknowledges, however, that it was not submitted on a grievance

form, but instead was "on a paper."  *Id.*  Plaintiff admits that he never filed

grievances or appealed hearing determinations regarding the inadequate

supervision at the WCJ, the interference with his legal mail, the denial of

the ability to call a witness at his disciplinary hearing, or the harassing

comments made to him by any officers at the WCJ.  *Id.* Exh. A, at 48, 91-

92, 152.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on February 2, 2005.  Complaint (Dkt.

No. 1).   Named as defendants in Walton's complaint are Corrections

Sergeants William Breeyear and Michael Mondoux; Corrections Officers

David Jamieson and Ford Burch; Julie Beecher, a Nurse Administrator at

the WCJ; and Albert Paolano, M.D., a licensed physician engaged to

perform medical services at the WCJ.[12]  Issue was thereafter joined by the

filing of answers on behalf of the County defendants, on April 13, 2005,

_____

        [12]     Plaintiff's complaint also named the fellow inmate involved in the
December 25, 2004 fight.  The court *sua sponte* ordered dismissal of plaintiff's claims
against that defendant, however, based upon the lack of any showing of state action
required to support a claim against him under 42 U.S.C. § 1983.  *See* Dkt. No. 5.

and defendant Paolano, on April 28, 2005.  Dkt. Nos. 8, 11.

On April 28, 2006, defendant Paolano moved seeking the entry of summary judgment dismissing plaintiff's complaint.  Dkt. No. 28.  In his motion, defendant Paolano argues that as a matter of law, plaintiff cannot establish that he acted with deliberate indifference to Walton's medical needs during his confinement at the WCJ.  *Id.*

On May 1, 2006, the County defendants followed suit, also moving for summary judgment dismissing plaintiff's complaint.  Dkt. No. 29.  In their motion, the County defendants argue that plaintiff's claims are barred by virtue of his failure to exhaust available administrative remedies, as required under 42 U.S.C. § 1997e(a), and additionally contend that, as a matter of law, the record fails to disclose any deliberate indifference on their part to Walton's safety or medical needs, and that the evidence relating to plaintiff's remaining claims does not support a finding of any constitutional violations.

In light of plaintiff's failure to file any opposition papers, defendants' motions are now ripe for determination and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See*

*also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

  A.   Summary Judgment Standard

  Summary judgment is governed by Rule 56 of the Federal Rules of

Civil Procedure.  Under that provision, summary judgment is warranted

when "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits . . . show that there is no

genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505,

2509-10 (1986); *Security Insurance Co. of Hartford v. Old Dominion*

*Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material",

for purposes of this inquiry, if "it might affect the outcome of the suit under

governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also*

*Jeffreys v. City of New York*, 426 F.3d 549,553 (2d Cir. 2005)(citing

*Anderson*).  A material fact is genuinely in dispute "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  Though *pro se* plaintiffs

are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Insurance*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.*

17

*Coughlin*, 132 F.3d 133, 137-8 (2d Cir. 1998).  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); *see also Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

B.    Defendants' Failure to Respond to Plaintiff's Local Rule 7.1(a)(3) Statement

Before turning to the merits of defendants' motions, it is necessary to first address plaintiff's failure to submit opposition papers, and the legal significance of that demurrer.  By letters submitted to the court following expiration of the deadline for submission of responsive filings, both groups of defendants have urged the court to treat their motions as unopposed, and to grant them the relief sought on that basis.  *See* Dkt. Nos. 35, 36.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

18

N.D.N.Y.L.R.7.1(b)(3).  Recognizing that *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions *(see Jemzura v. Public Service Comm'n*, 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.)), courts in this district have nonetheless granted dispositive motions pursuant to Local Rule 7.1(b)(3) in appropriate circumstances, based upon the lack of proper response by *pro se* litigants.  *See*, *e.g.*, *Robinson v. Delgado*, 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski*, 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F.Supp. 106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.).  As can be seen by the face of Local Rule 7.1(b)(3), however, before summary judgment can be granted – even in the absence of opposition – the court must review the motion to determine whether it is facially meritorious.  *See Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 231-32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp.2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.).

While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted,

that failure is not without consequences.  By opting not to submit papers

in opposition to their motion, plaintiff has left the facts set forth in

defendants' Local Rule 7.1(a)(3) Statements unchallenged.  Courts in this

district have not hesitated to enforce Local Rule 7.1(a)(3) and its

predecessor, Local Rule 7.1(f), by deeming facts set forth in a statement

of material facts not in dispute to have been admitted based upon an

opposing party's failure to properly respond to that statement.[13]  *See*, *e.g.*,

*Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug.

22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York

City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district

courts' discretion to adopt local rules like 7.1(a)(3)).  I recommend that the

court follow this well-established practice and, notwithstanding plaintiff's

*pro se* status, accept defendants' assertions of facts as set forth in their

Local Rule 7.1(a)(3) Statements as uncontroverted, in light of plaintiff's

failure to respond to those statements, and that defendants' motions be

analyzed for facial sufficiency, considered in that context.

    C.    <u>Failure to Exhaust Administrative Remedies</u>

---

      [13]    According to Local Rule 7.1(a)(3), "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."  *See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis omitted).

In their motion, the County defendants argue that plaintiff is effectively precluded from pursuing his claims in this case on the procedural basis of his failure to fulfill the requirement that he exhaust available administrative remedies before commencing the action.[14]

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), altered the inmate litigation landscape considerably, imposing several restrictions on the ability of prisoners to maintain federal civil rights actions.  One such restriction introduced by the PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002).

---

[14]      Although in his answer defendant Paolano asserted plaintiff's failure to exhaust administrative remedies as an affirmative defense, he has not pressed the argument in his summary judgment motion.

From the record now before the court it appears that during the relevant times there was in place at the WCJ a process designed to allow inmates to register internal complaints regarding conditions of confinement at the facility, as required in New York.  *See* 9 N.Y.C.R.R. Part 7032.  The County defendants, however, have not submitted to the court anything which would describe that process or, importantly, detail an inmate's responsibilities in filing and pursuing a complaint regarding prison conditions through the prescribed mechanism.  The court would therefore be somewhat handicapped in determining whether, and if so to what extent, the plaintiff met his obligation to exhaust available administrative remedies in order to vent the claims set forth in his complaint internally before commencing this action, were the issue properly before the court.[15]

The court need not examine the issues surrounding the County defendants' exhaustion argument, however, given their failure to properly preserve the issue.  It is well established that failure to comply with the

---

[15]     There is some uncertainty surrounding the plaintiff's efforts to comply with the PLRA's exhaustion requirement.  He claims, for example, to have filed one grievance on a blank paper, and additionally maintains that he filed a grievance regarding the care and treatment received for his ear injury, although he has been unable to produce a copy of that grievance.  These assertions present potential issues of fact which could potentially preclude the entry of summary judgment on this basis.  *See*, *e.g.*, *Gill v. Frawley*, No. 9:02-CV-1380, 2006 WL 1742738, at *8-*11 (N.D.N.Y. June 22, 2006) (McAvoy, S.J. & Lowe, M.J.); *O'Connor v. Featherston*, No. 01 CIV 3251, 2002 WL 818085, at *2-*3 (S.D.N.Y. Apr. 29, 2002);

PLRA's exhaustion requirement is a waiveable, affirmative defense which, if not properly interposed, does not present a bar to prosecution of a claim under 42 U.S.C. § 1983. *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004); *Thomas v. Keyser*, No. 01 Civ. 5615, 2004 WL 1594865, at *2 (S.D.N.Y. July 16, 2004).  In this instance the County defendants, while asserting several other affirmative defenses, did not include failure to exhaust administrative remedies as one of them.  *See* Dkt. No. 8.  It is true that in their answer, those defendants did admit the portions of plaintiff's complaint alleging the existence of a grievance procedure at the WCJ, going on to deny the remaining allegations pertaining to plaintiff's efforts to grieve the matters set forth in his complaint.  Those denials, however, are insufficient, in the court's view, to satisfy the requirement of pleading, as an affirmative defense, failure to exhaust administrative remedies.

Because the County defendants have waived the defense to plaintiff's claims in this action based upon exhaustion of remedies, now advanced in support of their motion for summary judgment, I recommend denial of the portion of their motion which relies upon this as a ground for dismissal of plaintiff's section 1983 claims.

23

D.    Deliberate Indifference

The vast majority of the matters raised in plaintiff's complaint implicate the Eighth Amendment's prohibition against cruel and unusual punishment.[16]  Included among the deliberate indifference claims set forth in plaintiff's complaint are those relating to the booking and holding cell incident and the alleged failure of prison officials to meet his medical needs following the December 25, 2004 fight.  In their motions, defendants assert that none of the matters alleged by plaintiff to constitute deliberate indifference rise to a level of constitutional proportions.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble*, 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia*, *Estelle*).  While the Eighth Amendment does not mandate comfortable

---

[16]    The Eighth Amendment's protections extend only to sentenced prisoners. *See Ali v. Szabo*, 81 F.Supp.2d 447, 453-54 (S.D.N.Y. 2000).  It is unclear from the record whether, at the time of the relevent events, plaintiff's parole status had formally been revoked and he had been sentenced on that revocation.  I have nonetheless analyzed plaintiff's claims under the Eighth Amendment rather than the substantive due process clause of the Fourteenth Amendment, which provides parallel protections to pretrial detainees.  *Id.*

prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference".  *See Leach v. Dufrain*, 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991)); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.); *see also generally Wilson*, 501 U.S. 294, 111 S. Ct. 2321.  Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1978; *Leach*, 103 F. Supp.2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809,

at *2 (same).

### 1. Medical Indifference

_____In his complaint plaintiff asserts that medical personnel at the WCJ, including Dr. Paolano and Nurse Beecher, were deliberately indifferent to his medical needs by failing to properly treat his injuries sustained during the fight with his fellow inmates.  Defendants respond that this indifference claim lacks merit as a matter of law.

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, "'sufficiently serious'".  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citing *Wilson*, 501 U.S. at 298, 111 S. Ct. at 2324), *cert. denied sub nom.*, *Foote v. Hathaway*, 513 U.S. 1154, 115 S. Ct. 1108 (1995).  A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted).  A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'"; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be

26

unconstitutional, depending on the facts. *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting, *inter alia*, *Chance*). Relevant factors in making this determination include injury that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or causes "'chronic and substantial pain.'" *Chance*, 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County*, No. CIV. 9:00CV774, 2002 WL 31309244, at *2-*3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.).

Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Leach*, 103 F. Supp.2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

It is well established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 201-02; *Chance*,

27

143 F.3d at 703; *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040, 113 S. Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients.  *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Chance*, 143 F.3d at 703; *Rosales v. Coughlin*, 10 F. Supp.2d 261, 264 (W.D.N.Y. 1998).

A review of the record now before the court, including medical submissions and an affidavit from Dr. Albert Paolano, one of the defendants, reflects that plaintiff received extensive treatment for his injuries including, notably, to his ear, beginning on December 26, 2004 when he first requested treatment, and that he was examined and treated frequently during the interval between that first medical encounter and his transfer out to the Downstate Correctional Facility in late January, 2005.

On the day of the fight, according to plaintiff, he was provided an ice pack and given Tylenol.  Nash Aff. (Dkt. No. 28) Exh. A, at 37-38.  Plaintiff again received medical care on December 26, 2004, the day that he first

formally requested such care by filling out a medical request form.  Nash
Aff. (Dkt. No. 28) Exh. G.  As defendants point out, and the record
substantiates, plaintiff received medical attention each time it was
requested, and, in fact, plaintiff was seen at least five times in the four
days following his injury.  *See* Nash Aff. (Dkt. No. 28) Exhs. G-I.  During
those visits, Walton received antibiotics to prevent infection, cotton balls to
keep water out of his ears while showing, and Motrin to relieve any pain.
*Id.*

Each of Dr. Paolano's treatments of plaintiff included examination of
the rupture site.  *See* Nash Aff. (Dkt. No. 28) Exhs. H-J; Paolano Aff. (Dkt.
No. 28) ¶¶ 5-8.  Dr. Paolano further noted no infection of plaintiff's ear,
and that the ruptured tympanic membrane appeared to be healing on its
own accord.  *Id.*  The record reflects that Nurse Beecher, who also
examined plaintiff a number of times, kept in contact with Dr. Paolano and
repeated his instructions to plaintiff.  *See* Nash Aff. (Dkt. No. 28) Exh. I.

According to Dr. Paolano, a majority of perforations of the tympanic
membrane undergo spontaneous closure with conservative treatment; as
such, the generally accepted course of treatment of such a condition is
focused on the prevention of infection, the continued evaluation of the

perforation for closure, and keeping water out of the ear canal during the healing process.  Paolano Aff. (Dkt. No. 28) ¶ 10.  The record and defendants' Local Rule 7.1(a)(3) Statements reflect that the defendants conformed to that standard of care.  Indeed, plaintiff was afforded the same care by Dr. Paolano and Nurse Beecher as was provided by the specialist who later treated him following his transfer into custody of the DOCS.

As to plaintiff's claim that he should have been referred to a specialist, the decision of whether evaluation by a specialist is warranted in any particular case is the very kind of treatment decision which, courts have recognized, does not alone state a cognizable claim under the Eighth Amendment.  *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Chance*, 143 F.3d at 703; *see also*, *e.g.*, *Marshall v. Strack*, No. 96 Civ. 6789, 1998 WL 118167, at *3 (S.D.N.Y. Mar. 16, 1998) (failure to refer inmate suffering from severe and persistent rash to dermatologist was not deliberate indifference).  There is no evidence in the record which suggests that further examination by a specialist was medically necessary, or that any different treatment would have eventuated as a result of such a visit.  Simply stated, plaintiff's disagreement about the

need for referral to a specialist does not state a claim against the defendants for deliberate indifference to his serious medical needs. *Marshall*, 1998 WL 118167, at *3 ("At most, the failure to refer Plaintiff for an outside . . . consultation amounts to negligence or inadequate treatment.").

In sum, the record clearly shows that plaintiff received appropriate and frequent treatment.  Accordingly, even if plaintiff can establish that his injury constitutes a serious medical need, no reasonable factfinder could conclude that the defendants were deliberately indifferent to plaintiff's medical needs.[17]  *See*, *e.g.*, *Taylor v. Kurtz*, No. 00-CV-700, 2004 WL 2414847, at *4 (W.D.N.Y. Oct. 28, 2004); *Espinal v. Coughlin*, No. 98 CIV. 2579, 2002 WL 10450, at *5 (S.D.N.Y. Jan. 3, 2002); *Culp v. Koenigsmann*, No. 99 Civ. 9557, 2000 WL 995495, at *9 (S.D.N.Y. July 19, 2000).  Plaintiff's medical indifference claim is therefore subject to dismissal as a matter of law.

### 2.   Verbal Harassment and Humiliation

---

[17]      An argument could be made that plaintiff's ear injury did not constitute a serious medical need sufficient to trigger the protections of the Eighth Amendment. *See Feazell v. Augusta County Jail*, 401 F.Supp. 405, 407 (D. Va. 1975).  Because neither of the defendants' motions press this as a basis for dismissal of plaintiff's medical indifference claims, I have not based my recommendation upon such a finding.

Portions of plaintiff's complaint center upon his initial booking into the WCJ and having been placed in a holding cell for observation, apparently based upon allegations that he possessed, and may have swallowed, drugs at the time of his arrest.

Plaintiff's allegation that while there he was laughed at, harassed, and called racially motivated names, liberally construed, asserts a cruel and unusual punishment claim under the Eighth Amendment.[18]   As an example of the type of conduct alleged, plaintiff claims that Officer Jamieson called him racially motivated names such as "coon" and "darkie."  Complaint (Dkt. No. 1) § 6.  Plaintiff also claims to have been laughed at and taunted by Sergeant Breeyear and Officer Jamieson during his initial entry into WCJ.  *Id*.  In their motion, the County defendants argue even if plaintiff could prove such allegations true, they do not rise to the level of a constitutionally significant violation.

As defendants have argued, claims against corrections workers which are premised upon the type of verbal abuse alleged in plaintiff's complaint – absent more, such as a showing of retaliatory animus and a chilling effect upon the plaintiff's exercise of protected rights, *see Garrett v.*

---

[18]     During his deposition plaintiff acknowledged that while in the booth he was unable to hear any of the comments being made at the time.  Nash Aff. (Dkt. No. 28) Exh. A, at 98-102.

*Reynolds*, No. Civ.9:99CV2065, 2003 WL 22299359, at *4-*5 (N.D.N.Y.

Oct. 7, 2003) (Sharpe, M.J.) – do not rise to a level of constitutional

significance. *Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 WL 949457, at

*3 (N.D.N.Y. June 29, 2000) (Mordue, J.).  Having carefully reviewed the

contents of plaintiff's complaint and deposition, I find that the complaint

fails to assert a violation of constitutional proportions.  Accordingly, I

recommend the County defendants' motion to dismiss plaintiff's verbal

abuse claims be granted.

    E.   <u>Failure to Protect</u>

Among plaintiff's claims is a potential cause of action against the

defendants for their failure to protect him against danger posed by

exposure to his fellow inmate.  Defendants seek dismissal of this claim.

This claim is properly analyzed under both the Eighth Amendment and

Fourteenth Amendment.

    1.   <u>Eighth Amendment</u>

Unquestionably, under the Eighth Amendment prison officials are

required to take reasonable measures to guarantee the safety of inmates;

this duty includes within it an obligation to protect prisoners from harm

caused by fellow inmates.  *Farmer v. Brennan*, 511 U.S. 825, 833-34, 114

S. Ct. 1970, 1976-77  (1994) (citations omitted); *see also Matthews v. Armitage*, 36 F. Supp.2d 121, 124 (N.D.N.Y. 1999) (Homer, M.J.) (citing, *inter alia*, *Farmer*).  When examining a failure to protect claim under the Eighth Amendment, a court must determine whether the inmate has demonstrated that 1) he or she was incarcerated under conditions posing a substantial risk of serious harm, and that 2) prison officials exhibited deliberate indifference to the inmate's plight.  *Farmer*, 511 U.S. at 834, 837, 114 S. Ct. at 1977, 1979; *Matthews*, 36 F. Supp.2d at 124-25; *Coronado v. Lefevre*, 886 F. Supp. 220, 224 (N.D.N.Y. 1995) (Scullin, J.).  As can be seen, this analysis entails both an objective and subjective inquiry.

### a)   Objective Test

____In objective terms, a plaintiff must prove that an alleged deprivation is "sufficiently serious" such that it denied him or her the "minimal civilized measure of life's necessities."  *Dawes v. Walker*, 239 F.3d 489, 493-94 (2nd Cir. 2001) (internal quotations and citations omitted), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992 (2002).  Specifically, as noted above, in situations where an inmate's safety is at issue, that person must demonstrate that he or she was

34

incarcerated under conditions posing a substantial risk of serious harm. *Farmer*, 511 U.S. at 834, 837, 114 S. Ct. at 1977, 1979; *Dawes*, 239 F.3d at 493; *Matthews*, 36 F.Supp.2d at 124-25.

Based upon the record now before the court, resolving all the ambiguities and drawing all inferences in a light most favorable to him, I am unable to say that plaintiff was not incarcerated under conditions posing a substantial risk of serious harm.  During his deposition plaintiff testified to an incident which preceded the December 25, 2004 fight, in which he was allegedly "jumped" by a group of inmates, and additionally claimed to have received threats from the inmate involved in the altercation as well as other inmates prior to the incident.  Nash Aff. (Dkt. No. 28) Exh. A, at 21-24.  Defendants are therefore not entitled to summary judgment based upon plaintiff's alleged failure to satisfy the objective prong of the applicable test.

> b)   <u>Subjective Test</u>

Although Walton may be able to satisfy the objective prong of the Eighth Amendment inquiry, the evidence now before the court fails to satisfy the additional subjective state of mind requirement.  To demonstrate that defendants were deliberately indifferent to his plight,

plaintiff must show that prison officials actually knew of, but disregarded, an excessive risk to his health and safety – "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Matthews*, 36 F. Supp. 2d at 124-25.

Leaving aside the altercation on December 25, 2004, there is no evidence now before the court from which a reasonable factfinder could conclude awareness on the part of any of the named defendants of a substantial risk of serious harm to plaintiff's health and safety, and their disregard of that risk.  Plaintiff admits that on the day of the fight he purposely fashioned and secreted a weapon in his sleeve, asked Officer Jamieson to let him out of his cell, and then used that weapon as he apparently had intended.  Nash Aff. (Dkt. No. 28) Exh. A, at 29, 31-34, 149-50.  Walton further admits that he did not have to come out of his cell when he did, and that he could have retreated back to where Officer Burch was standing and asked him for help, but chose not to do so.  *Id.*, at 150.

Plaintiff never advised any correction officers that his safety was at risk from the inmate in which he got into an altercation, nor did he request

help from any correction officer.  *Id.*, at 21, 139.  Walton testified that he

never requested a "no contact" order, an act which would have signaled to

prison officials that he was fearful of other inmates at the facility.  *Id.*, at

21.  Moreover, plaintiff admits Officer Burch responded to the altercation

before the need for his assistance was requested by either inmate or

made evident by the exchange of physical contact.  *Id.*, at 32-34.

Even viewing the facts in the light most favorable to plaintiff, a

reasonable factfinder could not conclude that defendants, and in particular

defendant Burch, subjectively knew of an excessive risk of danger to the

plaintiff but failed to take appropriate measures to protect him.  I therefore

recommend dismissal of plaintiff's failure to protect claim, asserted under

the Eighth Amendment.

2.   Failure to Protect – Fourteenth Amendment

Claims involving the alleged failure of prison officials to protect an

inmate from harm are also subject to review under the Fourteenth

Amendment's substantive due process provision.  Though the requisite

mental state for establishing a Fourteenth Amendment failure to protect

claim is somewhat unclear, it is at least apparent that to be legally

cognizable under that provision, the actions alleged on the part of a

37

defendant must transcend mere negligence. *Davidson v. Cannon*, 474 U.S. 344, 347-48, 106 S. Ct. 668, 670 (1986) (lack of due care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent); *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 663 (1986) (same); *Morales v. New York State Dep't of Corrs*., 842 F.2d 27, 30 (2nd Cir. 1988) (section 1983 does not provide cause of action for negligent failure of prison officials to protect an inmate from injury); *Abdul-Matiyn v. New York State Dept of Corr. Servs*., 871 F.Supp. 1542, 1546-47 (N.D.N.Y. 1994) (Chin, J.) (citing *Morales*).

As was previously noted, there is no evidence in the record now before the court from which a reasonable factfinder could conclude that the defendants were aware of a risk of danger to plaintiff's safety.  At no time did plaintiff communicate to prison officials a need for protection.  On the date of the altercation, after breaking a cup to create a weapon, it was the plaintiff who requested permission to leave his cell, placing in motion the circumstances giving rise to the fights.  Moreover, by all accounts it was the plaintiff who was the aggressor in the incident, rather than the fellow inmate who was not, as plaintiff has pointed out, disciplined as was the plaintiff.  In short, there is no basis upon which a reasonable factfinder

38

could conclude that defendants were aware of but overlooked or failed to take precautions to eliminate a risk of danger to the plaintiff presented by fellow inmates at the WJF.

   F.   Legal Mail Interference

   Plaintiff's complaint also appears to allege interference with his legal mail based on an incident where defendant Mondoux opened his legal mail, and a delay in sending out other mail.

____Prison officials' interference with legal mail implicates an inmate's First and Fourteenth Amendment rights to access the courts and free speech.  *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003).  As with many of the constitutional protections afforded to incarcerated individuals, however, an inmate's access to the courts is not absolute.  To the contrary, the Constitution guarantees inmates only reasonable access to the courts.  *See Smith v. O'Connor*, 901 F. Supp. 644, 648 (S.D.N.Y. 1995); *see also Bounds v. Smith*, 430 U.S. 817, 825, 97 S. Ct. 1491, 1496 (1977).  And, since reasonable access is all that is mandated, it follows for example that an interference which only delays a prisoner's ability to communicate with the courts is not alone a violation of a constitutional right.  *Richardson v. McDonnell*, 841 F.2d 120, 122 (5th Cir. 1988) (no

constitutional violation based solely on a delay in prisoner mail);

*Warburton v. Underwood*, 2 F.Supp.2d 306, 312 (W.D.N.Y. 1998) ("[T]he

mere delay in serving some court documents does not state a

constitutional claim.").

   The Second Circuit has held that in order for a plaintiff to state a claim

for denial of access to the courts due to interference with legal mail, the

plaintiff must show that the defendant caused actual injury – that is, that

the defendant "took or was responsible for actions that hindered [a

plaintiff's] efforts to pursue a legal claim." *Davis*, 320 F.3d at 351 (citation

and internal quotations omitted); *see also Cancel v. Goord*, No. 00 CIV

2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) ("[I]n order to

survive a motion to dismiss a plaintiff must allege not only that the

defendant's alleged conduct was deliberate and malicious, but also that

the defendant's actions resulted in actual injury to the plaintiff such as the

dismissal of an otherwise meritorious legal claim.") (citation omitted).

   Additionally, a prisoner's right to the free flow of incoming and

outgoing mail is protected by the First Amendment.  *Davis*, 320 F.3d at

351 (citations omitted).  "Restrictions on prisoners' mail are justified only if

they 'further[ ] one or more of the substantial governmental interests of

security, order, and rehabilitation . . . [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'" *Id.* (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).

While a prisoner has a right to be present when his or her legal mail is opened, *Wolff v McDonnell*, 418 U.S. 539, 574-76, 94 S. Ct. 2963, 2983-85 (1974), an isolated incident of mail tampering is usually insufficient to establish a constitutional violation.  *Davis*, 320 F.3d at 351 (citations omitted).  An inmate must show that prison officials "regularly and unjustifiably interfered with the incoming legal mail." *Id.* (citation and internal quotations omitted).  Moreover, "'mere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.'" *Chavis v. Kienert*, No. 9:03-CV-0039, 2005 WL 2452150, at *14 (N.D.N.Y. Sept. 30, 2005) (Scullin, C.J.) (quoting *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995)).

Applying these principles, I find that plaintiff's claims regarding interference with his legal mail must also fail.  In support of his claim, plaintiff alleges, in one instance, a legal letter was open before he received it and, on a few occasions, his outgoing mail was held up a day

41

or two.  Nash Aff. (Dkt. No. 28) Exh. A, at 141-44.  As the relevant case law suggests, neither of these allegations rise to the level of a constitutional violation.

Additionally, Walton claims that two pieces of outgoing mail were not sent out – the grievance regarding his medical care, and a letter to the United States Marshal regarding service of the complaint in this case.  *Id.* Exh. A, at 144-47.  Assuming this to be true, plaintiff's claims must nevertheless fail because he has not alleged an injury resulting from the interference.  As previously discussed, plaintiff cannot show that the defendants were deliberately indifferent regarding his medical care. Moreover, plaintiff was able to institute this suit without any major service or jurisdictional issues.

While defendants' motion papers appropriately do not challenge the factual underpinnings surrounding the mail claim, they argue in their brief that such an isolated incident is insufficient to constitute a violation of an inmate's constitutional rights.  Having reviewed the record before the court, and without the benefit of clarification regarding plaintiff's position, I agree and conclude that the allegations set forth in plaintiff's complaint are insufficient to establish a constitutional violation.  *Davis*, 320 F.3d at 351

(to establish such a claim an "inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail.") Accordingly, I recommend dismissal of plaintiff's legal mail claim.

G.    Procedural Due Process

____The last claim potentially set forth in plaintiff's complaint concerns his allegation that he was denied the opportunity to call witnesses at the disciplinary hearing convened to address charges arising from the December 25, 2004 altercation.  The County defendants maintain that this claim is legally deficient in light of plaintiff's failure to establish the denial of a liberty interest sufficient to trigger the procedural protections of the Fourteenth Amendment.

To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process.  *See Tellier v. Fields*, 260 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

In *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293 (1995), the

43

United States Supreme Court held that to establish a constitutionally protected liberty interest, a plaintiff must sufficiently demonstrate that 1) the State actually created a protected liberty interest in being free from segregation; and that 2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S. Ct. at 2300; *Tellier*, 280 F.3d at 80; *Hynes*, 143 F.3d at 658.  It is now firmly established in this circuit that New York has, by its regulatory scheme, created a liberty interest in not being confined to a facility SHU.  *See Palmer v. Richards*, 364 F.3d 60, 64 n.2 (2d Cir. 2004) (citing *Welch v. Bartlett*, 196 F.3d 389, 394 n.4 (2d Cir. 1999)); *see also Alvarez v. Coughlin*, No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.)).  The liberty interest analysis in this case thus turns on whether the conditions of plaintiff's SHU confinement rose to the level of an atypical and significant hardship under *Sandin*.

_____The issue of atypicality in a *Sandin* inquiry normally presents a question of law.[19]  *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).  When determining

---

[19]      In cases where there is factual dispute concerning the conditions or duration of confinement, however, a court may nonetheless find it appropriate to submit those disputes to a jury for resolution.  *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

whether a plaintiff relegated to SHU confinement has been deprived of a

liberty interest, district courts must examine the specific circumstances of

confinement, including analysis of both the length and conditions of

confinement.  *See Sealey*, 197 F.3d at 586; *Arce v. Walker*, 139 F.3d 329,

335-36 (2d Cir. 1998); *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir.

1997).  In cases involving shorter periods of segregated confinement

where the plaintiff has not alleged any unusual conditions, a detailed

explication of the reasoning for finding no such deprivation is not

necessary.[20]  *Hynes*, 143 F.3d at 658; *Arce*, 139 F.3d at 336.

Additionally, the Second Circuit has indicated that the appropriate focus

for alleged due process violations may be on the actual length of time

served in disciplinary confinement rather than the maximum potential

penalty.  *Colon*, 215 F.3d at 231 n.4.

In this case defendants assert, and plaintiff admits, that he was

---

[20]     While not the only factor to be considered, the duration of a disciplinary
keeplock confinement remains significant under *Sandin*.  *Colon*, 215 F.3d at 231.
Specifically, while under certain circumstances confinement of less than 101 days
could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n.5), the
Second Circuit generally takes the position that SHU confinement under ordinary
conditions of more than 305 days rises to the level of atypicality, whereas normal SHU
confinement of 101 days or less does not.  *Id.* at 231-32 (305 days of SHU
confinement constitutes an atypical and sufficient departure).  The Second Circuit,
however, has "explicitly avoided a bright line rule that a certain period of SHU
confinement automatically fails to implicate due process rights."  *Palmer*, 364 F.3d at
64 (citations omitted).

sentenced to SHU for eighty days per violation, or a total of 400 days, but only served a total of thirty-two days.  Nash Aff. (Dkt. No. 28) Exh. A, at 47. There is nothing in the record to suggest that the disciplinary confinement continued beyond the date of plaintiff's transfer to the Downstate Correctional Facility in late January of 2005.  Service of thirty-two days in SHU confinement, without more, is insufficient to establish the denial of a liberty interest sufficient to trigger the procedural requirements of the Fourteenth Amendment.  *Sandin*, 515 U.S. at 485-86, 115 S. Ct. at 2301.  I therefore recommend dismissal of plaintiff's procedural due process claim for failure to make this required, threshold showing.

## IV.   SUMMARY AND RECOMMENDATION

While it appears that several, though not all, of plaintiff's claims were not subject to grievances filed by him while at the WCJ, the failure of the County defendants to assert in their answer, as an affirmative defense, plaintiff's failure to exhaust available administrative remedies precludes them from now seeking dismissal of plaintiff's complaint on this procedural basis.  Turning to the merits of defendants' motions, which are unopposed, I find that none of plaintiff's allegations rise to a level of constitutional significance and, accordingly, no reasonable factfinder could conclude that his constitutional rights were violated.  It is therefore hereby

RECOMMENDED, that defendants' motions for summary judgment dismissing plaintiff's complaint (Dkt. Nos. 28, 29) be GRANTED and plaintiff's complaint be DISMISSED in all respects, with prejudice.

NOTICE:  pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation.  Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties by regular mail.

David E. Peebles
U.S. Magistrate Judge

Dated:     October 25, 2006
           Syracuse, NY

G:\internwork\Ritts\Civil Rights\Walton.wpd

47